# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

JAMES F. RIGBY, Chapter 7 Trustee of Michael R. Mastro,

    Plaintiff,

v.

MICHAEL J. CORLISS,

    Defendant.

NO. C14-0340RSL

MEMORANDUM OF DECISION

This matter was heard by the Court in a bench trial commencing on July 9, 2018. Plaintiff James T. Rigby, the Chapter 7 trustee of the bankruptcy estate of Michael R. Mastro, filed this lawsuit to recover damages arising from the conversion of certain estate assets, to force defendant Michael J. Corliss to surrender $111,600, and to recover damages arising from misstatements Corliss made to the trustee.

**FINDINGS OF FACT**

By a preponderance of the evidence, the Court finds as follows:

On August 21, 2009, the United States Bankruptcy Court for the Western District of Washington granted an involuntary bankruptcy petition filed by some of Mastro's creditors. Mastro had been a prominent real estate developer and financier in the Pacific Northwest, but was unable to weather the financial crisis in the late 2000s.

MEMORANDUM OF DECISION - 1

During the winter of 2010 and spring of 2011, Mastro and his wife, Linda, lived in Palm Desert, California. Their Medina mansion had been sold as part of the bankruptcy proceeding, but the Mastros retained a Range Rover, a Bentley, Chihuly art, jewelry, and other assets. Corliss and his wife, Lauri, were also staying in Palm Desert and met the Mastros at a New Years party. Corliss and Mastro knew each other prior to this meeting. Corliss had purchased a roof truss manufacturing business from Mastro in 1985. Corliss and Mastro occasionally saw each other socially in the intervening years, and Corliss thought favorably of Mastro. Lauri Corliss had met the Mastros a couple times before the New Years meeting, but it was not until this encounter that she and Linda Mastro hit it off.

Lauri Corliss felt bad for the Mastros: they had suffered great financial loss through the real estate downturn and had had their name and reputation dragged through the mud. She appreciated that Corliss, who was also heavily invested in real estate, could have suffered the same fate: the banks were pushing hard to collect payments on outstanding loans during the height of the downturn, and Lauri Corliss understood how you could fall behind and get pushed into bankruptcy. Linda Mastro, for her part, felt ostracized and destitute, turning to Lauri Corliss for a sympathetic ear and, in some instances, for financial help.[1] Over the course of approximately four months, the Mastros and the Corlisses had lunch and/or dinner together approximately ten times, and Lauri Corliss and Linda Mastro became friends.

At some point, Corliss got the impression that Mastro was going to ask him for money. At the time, Corliss had been lending to various business partners to help keep them afloat during

---

[1] At one point the trustee seized skis, ski clothes, and Christmas ornaments from the Mastros in Palm Desert to sell for the benefit of the creditors. Linda asked Lauri to buy the items at the bankruptcy sale and hold them until they could buy them back. Lauri paid $4,200 for the items.

MEMORANDUM OF DECISION - 2

the downturn, and he was inclined to be of help. The business Corliss had purchased from Mastro twenty-five years earlier had done very well, and he knew that if Mastro were asking for money, he must be in a really tough spot. When Corliss mentioned the possibility of helping Mastro to his wife, Lauri Corliss encouraged him to do so. Mastro did ask for financial assistance and, although Corliss was willing to make an unsecured loan of $50,000 (and would probably have gifted him the $50,000 if asked), Mastro insisted on providing 68 ounces of gold as collateral. The gold had a market value that exceeded the $50,000 loan amount, but Corliss viewed the arrangement as something akin to a line of credit where he would make additional disbursements as the Mastros needed it. Corliss believed that Mastro wanted to get back into the real estate business after his bankruptcy was resolved and would use this loan to reestablish his credit.

Corliss made no effort to confirm that Mastro owned the gold he offered as collateral before accepting it. At the time, the Mastros had been in bankruptcy for almost a year and a half and were living openly in California with a number of valuable assets in their possession. Neither Corliss nor his wife understood the details of the bankruptcy proceeding, but they knew that the Mastros were in Palm Desert because the trustee had seized their Seattle-area residence and had sold it and other assets for the benefit of Mastro's creditors. The Corlisses reasonably assumed that Mastro owned the assets in his possession, such as the gold Mastro offered as collateral, and that they were either not part of the bankruptcy estate or the trustee had chosen not to seize them.

Kara King, Corliss' assistant, was tasked with drafting the paperwork for the loan and disbursing checks. The form King utilized included Corliss' standard terms (6% interest, one year maturity date, 18% default interest rate) and indicated that the promissory note was

MEMORANDUM OF DECISION - 3

unsecured. It is undisputed, however, that Mastro provided the gold as collateral for the loan. King told Corliss that Mastro had requested that the loan be disbursed in multiple checks in specific denominations and asked if that were okay. Corliss approved, and King made the first disbursement on January 17, 2011.

Corliss and Lauri Corliss believed, and there is no evidence to the contrary, that the Mastros were asset rich and cash poor and that they were using the money Corliss gave them to pay living expenses such as rent, gas, and food. King disbursed additional checks to Mastro on January 28, 2011. As of the end of February, she reported to Corliss that only the first round of checks had been cashed: the others remained outstanding. Corliss asked King to find out whether and where the checks had been deposited. Although Corliss does not remember why he cared, he knew that Mastro had been ill and may have wanted to make sure they had been deposited or he may have been curious about where Mastro was doing his banking.

In April 2011, Mastro told Corliss that he had closed a deal, and he made a $111,600 payment on the loan balance.[2] Additional promissory notes were drawn up and additional checks disbursed in May and June. Each disbursement totaled $25,000, but was made up of three checks for $9,000, $9,000, and $7,000. Mastro occasionally provided handwritten loan updates that included disbursements, payments, balances, and new requests.

The Mastros's lease in Palm Desert ended in June 2011, and their Seattle-area home had been sold by the trustee. Corliss understood that the Mastros went to Vancouver, British Columbia, and were thinking of traveling across Canada. In July 2011, King received a note from Mastro asking that she use his sister's Seattle address to contact him until further notice:

---

[2] The evidence shows that the $111,600 was an inheritance from Mastro's sister. Regardless of the source of the money, it was acquired by Mastro after the bankruptcy filing and was not an asset of the bankruptcy estate.

MEMORANDUM OF DECISION - 4

the note was written on stationary from a hotel in Winnipeg, Manitoba. Shortly thereafter, Mastro wrote from Toronto, Ontario, to provide a loan update and request that Corliss wire the balance of the loan account, $94,500, which included the value Mastro assigned to the 68 ounces of gold, to a branch of the Royal Bank of Canada. Mastro indicated that he would prefer that the transaction be considered another loan for which he would send additional collateral. Corliss authorized the transfer, and King gave instructions for its transmission on July 20, 2011.

On July 20 and 21, the Mastros took their three dogs to an animal hospital in Toronto to get international health certificates. The hospital staff reported that the Mastros planned to fly by private jet to Lisbon, Portugal. On July 22, 2011, King forwarded a business journal article to Corliss indicating that the bankruptcy trustee had lost contact with Mastro, that Mastro was under a court order to turn over two diamond rings, and that there was a hearing scheduled that Friday. The Mastros failed to appear at the hearing, and bench warrants were issued for their arrests. The United States Department of Justice filed a sealed criminal complaint against Mastro for bankruptcy fraud on August 5, 2011. The evidence shows that Mastro had left Canada for Portugal shortly after receiving the wire transfer from Corliss.

Throughout this period, Linda Mastro and Lauri Corliss remained in contact via phone and/or email. At some point, Lauri Corliss became aware that the Mastros had left Canada for Europe and that the Mastros had missed a court date and could not come home until their attorneys had resolved the issues arising therefrom. Whenever the topic of homecoming came up, Linda Mastro bounced between optimism and resignation regarding their chances of favorably resolving the bankruptcy problems. By September 2011, both Corliss and his wife knew that the U.S. Marshal's Service was looking for the Mastros and that the bankruptcy court was looking for their assets.

MEMORANDUM OF DECISION - 5

In December 2011, the trustee retained "recovery counsel" to coordinate an international investigation of Mastro's whereabouts, activities, and assets. The trustee was looking for any and all assets and searched in many of the places Mastro had visited and/or had held assets, including the Isle of Man, Belize, Canada, Portugal, and ultimately France. At some point in the investigation, the trustee learned that Corliss had written Mastro one or more checks.

In May 2012, the trustee issued a subpoena to Corliss for "[a]ll documents related to any and all agreement(s) and any and all transaction(s), including any loan transaction(s), between you, or any entity in which you have a management or ownership interest, and Michael R. Mastro, covering the entire period of time from January 1, 2008 until the present, including all promissory note(s), cancelled check(s), bank statement(s), wire transfer receipt(s) etc." Plaintiff's Ex. 89. The trustee's lawyer explained that Mastro had failed to list all of his assets and business interests on the disclosures he filed with the bankruptcy court and the trustee was therefore attempting to track down assets through third parties. The trustee agreed to accept a sworn declaration from Corliss in lieu of conducting an in-person examination.

The declaration Corliss signed on August 20, 2012, stated that he had received no payments on the loans made to Mastro and provided a summary of "MJC Payments to Michael Mastro" that omitted the 68 ounces of gold, the $111,600 payment, or the wire transfer that zeroed out the account. These representations were incorrect or misleading, a fact acknowledged by Corliss at trial. The Court finds that the misrepresentations were not, however, intentional or fraudulent. Corliss' office staff compiled and provided a list of the checks that were written to Mastro and copies of the cancelled checks in response to the trustee's subpoena. The trustee's counsel used that information to draft the original declaration and attached the transaction summary, including the relevant misstatements. Corliss' attorney edited the declaration on other

MEMORANDUM OF DECISION - 6

points, but the gold collateral, the loan payment, and the wire transfer were not disclosed. King, Corliss' assistant, was on maternity leave at the time,[3] and Corliss did not give the matter the attention it deserved. The acknowledged misstatements were not caught or corrected.

Two weeks before Corliss signed the declaration, the trustee's investigator confirmed that Mastro had opened an account at the Royal Bank of Canada, with the first deposit recorded on July 22, 2011, from "TT Michael J. Company." On September 21, 2012, the trustee's trial counsel confirmed that the initial deposit into the Royal Bank of Canada account had been transmitted by Corliss. Counsel, acting in the combined role of investigator and prosecutor and jumping from one known fact to a number of unsupported conclusions, stated:

> Assuming this information is correct, this means that Corliss gave you a false affidavit and is assisting Mastro post-bankruptcy with concealing himself and his assets. As we have always thought, Corliss is intertwined with the fraud on the bankruptcy estate and you may have an action against him and his assets. All the more reason that this Canadian discovery action is important to the estate. I suggest that this information be discussed with Gayle [Bush, the trustee's original counsel] and the court so that our budget is not so limited.

Plaintiff's Ex. 63.[4]

The Mastros were arrested in France on October 24, 2012, and the trustee ultimately obtained and sold the assets in their possession. Because Corliss had not disclosed the wire transfer to Mastro in Canada in the August 2012 declaration, the trustee scheduled a Rule 2004 examination that was held on February 13, 2013, and continued on October 28, 2013. Shortly before the second examination, Corliss came to the conclusion that it would be difficult for him

---

[3] Corliss testified that without King, he did not have all four wheels on the ground.

[4] This document was discussed at trial, but was not admitted into evidence in order to avoid the spectacle of having trial counsel called to the stand to testify.

MEMORANDUM OF DECISION - 7

to prove that the 68 ounces of gold he held was not an asset of the bankruptcy estate and, rather than fight that battle, turned it over to the trustee on October 17, 2013.

The trustee argues that Corliss effectively laundered the 68 ounces of gold and the $111,600 in inheritance money by converting them into post-bankruptcy loans. These loans, the trustee argues, allowed the Mastros to flee to Europe and caused the trustee to incur over $2.5 million in international investigative costs,[5] deprived the trustee of his opportunity to garnish or otherwise take possession of the inheritance money, and resulted in a loss in the gold's value before it was sold in 2014.

## CONCLUSIONS OF LAW

**Count I: Conversion**

The trustee argues that Corliss willfully interfered with and converted estate property when he accepted 68 ounces of gold as collateral for the loans and concealed it from the trustee. Conversion "occurs when, without lawful justification, one willfully interferes with, and thereby deprives another of, the other's right to a chattel." Davenport v. Wash. Educ. Ass'n, 147 Wn. App. 704, 722 (2008). Wrongful intent is not a necessary element of conversion if the interference is unlawful, and good faith will be a defense only if there are conflicting claims to the property and the holder makes reasonably prompt efforts to ascertain the rightful claimant's identity. Paris Am. Corp. v. McCausland, 52 Wn. App. 434, 443 (1988); Olin v. Goehler, 39 Wn. App. 688, 694 (1985). "Once a conversion is established, the general measure of damages, absent willful misconduct, is the fair market value of the property at the time and place of the

---

[5] The trustee testified that he had incurred $2,518,008 in fees between December of 2011 and the date on which Corliss turned over the gold. In closing arguments, the trustee's counsel claimed that the trustee had incurred investigative costs of $2,855,866 between January 2011 and the date on which Corliss turned over the gold.

MEMORANDUM OF DECISION - 8

conversion." Eggert v. Vincent, 44 Wn. App. 851, 855 (1986). The burden is on the trustee to show both ownership of the gold and his right to possess it at the time of the alleged conversion. Junkin v. Anderson, 21 Wn.2d 256, 258 (1944).

The trustee has not met his burden. There is no evidence that the gold Mastro delivered to Corliss at the beginning of 2011 was part of the bankruptcy estate. The stipulated facts show only that Mastro and his son had purchased over 500 ounces of gold pre-bankruptcy (an invoice for 100 one-ounce gold bars is dated on or about March 23, 2009). There is no evidence linking the gold held by Corliss to a transaction that occurred almost two years earlier. The trustee acknowledged at trial that he did not have serial numbers for the gold Mastro purchased pre-bankruptcy and was therefore unable to say that the gold Corliss turned over (which had serial numbers on each box) was the same gold. Nor is there any evidence from which one could reasonably calculate the diminution in the gold's value from the time Corliss took possession to the time he turned the gold over to the trustee. Mastro's handwritten account summaries valued the gold at $100,232 in January 2011, $103,768 in May 2011, $104,720 in June 2011, and $109,072 in July 2011. Although the trustee was only able to raise $88,464 when he sold the gold sometime in 2014, there is no evidence regarding its value in October 2013 when he regained possession of it or whether the 2014 sale was at fair market value.

**Count II: Aiding and Abetting Conversion**

To establish a claim of aiding and abetting under Washington law, the trustee must show "(i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) that the aider and abettor substantially assisted in the primary wrong." In re: Consolidated Meridian Funds, 485 B.R. 604, 616 (W.D. Wash. 2013). The trustee claims that Mastro converted assets belonging to the bankruptcy estate, that an inference of knowledge

MEMORANDUM OF DECISION - 9

on Corliss' part arises from the fact that he failed to confirm Mastro's ownership of the gold and/or did not question why Mastro did not simply sell the goal himself if he needed to raise cash, and that Corliss' acceptance of the gold as collateral substantially assisted Mastro's conversion of the estate asset. The trustee also alleged, and obliquely argued at trial, that Corliss aided and abetted Mastro's conversion of non-gold assets, such as diamond rings, a Range Rover, seven suitcases worth of designer clothing, shoes, and purses, and 74 lots of jewelry, watches, and art, on the theory that, once he knew he was dealing with a converter, Corliss would reasonably foresee that Mastro would flee the country with any and all estate assets still in his possession.

Even if the Court assumes for purposes of this claim that the trustee proved that Mastro converted gold bars belonging to the bankruptcy estate, the trustee failed to prove by a preponderance of the evidence that Corliss was aware that Mastro had converted or was attempting to convert estate assets. There is no evidence that Corliss or his wife were aware that Mastro had cheated on his bankruptcy schedules or was attempting to abscond with estate assets. Although Corliss knew that Mastro was going through a bankruptcy and that he and his wife appreciated the finer things in life, there is no evidence that Corliss suspected, much less knew, that Mastro was gaming the system, hiding assets, and cheating his creditors. Corliss and his wife testified credibly about their interactions with the Mastros and their motivations for helping them. The Corliss' also testified credibly regarding their state of mind and relevant knowledge: that they thought the money they were providing would help pay living expenses while the Mastros worked through the bankruptcy proceeding, that they did not suspect that Mastro was defrauding his creditors or the trustee until after Corliss made the $94,500 wire transfer, that they believed that the assets the Mastros had in their possession were theirs to keep, that they

MEMORANDUM OF DECISION - 10

were unaware of any limitations on the Mastros's ability to travel, and that they did not know that the Mastros intended to leave Canada until after they were already in Europe.

The trustee's evidence of knowledge is based on omissions, namely that Corliss did not confirm that Mastro owned the gold before accepting it as collateral and that Corliss failed to disclose the gold and the loan payments in his August 2012 declaration. The Court understands why the trustee pursued this matter: the basic facts do not look good for Corliss, and it was entirely possible that his claims of innocence and lack of knowledge would be found incredible at trial. The opposite happened, however. Corliss' testimony was entirely credible, and facts that appeared damning (like the failure to disclose material facts in the declaration) were explained to the Court's satisfaction. Having now heard the testimony of the witnesses and considered all of the evidence in context, the Court finds that any assistance Corliss provided Mastro in his efforts to convert estate assets was unknowing and unintentional. There is nothing in the Corliss' personal or business backgrounds that would suggest that they would knowingly put their reputations and fortune at risk to assist Mastro in an illegal or fraudulent endeavor.

With regards to the other estate assets that were found with the Mastros in France, the trustee has not established that the checks or wire transfer Corliss sent Mastro substantially assisted the Mastros's conversion of those assets. When and how those assets found their way to France is unknown, as is the source of funds used to accomplish those transfers.

**Count III: Conspiracy to Convert**

A civil conspiracy is established by showing "by clear, cogent and convincing evidence that (1) two or more people contributed to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the object of the conspiracy." Wilson v. Wash., 84 Wn. App. 332, 350-

MEMORANDUM OF DECISION - 11

51 (1996). For the reasons discussed above, the trustee has not proven that Corliss knew of Mastro's underlying wrongdoing or agreed to convert estate assets.

**Count IV: Fraudulent Conveyance**

The trustee acknowledges that the $111,600 that Mastro transferred to Corliss as a payment on the loan was not, and never had been, an asset of the bankruptcy estate. Nevertheless, he seeks to void the transfer under Washington's Uniform Fraudulent Transfer Act. Pursuant to the version of the statute that governs this case,[6] a transfer by a debtor is fraudulent as to a creditor, regardless of whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor." RCW 19.40.041(a)(1) (effective to July 22, 2017). A fraudulent transfer is not voidable, however, if the recipient "took in good faith and for a reasonably equivalent value." RCW 19.40.081(a) (effective to July 22, 2017). If a good faith recipient gave value to the debtor in exchange for the transfer, he or she is entitled to a reduction in the amount of any liability and/or a credit for the value given. RCW 19.40.081(d) (effective to July 22, 2017).

The circumstances of this transfer give rise to a reasonable inference that Mastro intended to hinder, delay, or defraud his creditors by hiding the $111,600 from the trustee while retaining access to the funds through what was essentially an advance payment on a rotating line of credit. For the reasons set forth above, however, the Court finds that Corliss received the money in good faith as part of an on-going loan/credit transaction and without knowledge of Mastro's efforts to shield assets from his creditors. Whether Corliss took for a "reasonably equivalent

---

[6] The Uniform Fraudulent Transfer Act was replaced on July 22, 2017, by the Uniform Voidable Transactions Act.

MEMORANDUM OF DECISION - 12

value" for purposes of RCW 19.40.081(a) is a closer question, but in the circumstances presented here, it does not affect the outcome.

At the time the transfer occurred, Mastro's handwritten summary of the account shows that Corliss had disbursed $50,000 to Mastro and that Mastro was requesting another $25,000.[7] When the $111,600 payment was received, it more than offset the outstanding and contemplated loan balance. The Court declines to determine whether a transfer that overcompensated Corliss by $36,600 (or 49%) would constitute "reasonably equivalent value" if the relationship had ended at that point in time because that is not what happened. Over the course of the loan/credit transaction, reasonably equivalent value was given in exchange for the transfer. Corliss disbursed an additional $50,000 shortly thereafter, which completely erased the $36,600 overage. The $13,900 debt Mastro owed Corliss by the end of June 2011- as well as the later wire transfer of $94,500 - was secured by the gold Corliss held until it was turned over to the trustee in October 2013. Corliss, acting in good faith, gave Mastro value in exchange for the transfer of the inheritance money and is entitled to a credit for the loans provided. Thus, the transfer is either not voidable under RCW 19.40.081(a) or results in a net liability of zero under RCW 19.40.081(d).

**Count V: Fraudulent Misrepresentation**

In closing arguments, the trustee argued that the fraudulent misrepresentation claim is based on a fraud that began in January 2011 and was perpetuated by the false statements and omissions in Corliss' August 2012 declaration. In order to prove intentional misrepresentation or fraud, the trustee must show by clear, cogent, and convincing evidence that (1) Corliss made a

---

[7] Corliss was holding $100,232 in gold as collateral in case Mastro failed to repay the loans.

MEMORANDUM OF DECISION - 13

representation of an existing fact; (2) the representation was material; (3) the representation was false; (4) Corliss knew the representation was false; (5) he intended that the trustee act on the false representation; (6) the trustee was ignorant of the falsity of the representation; (7) the trustee relied on the representation; (8) the trustee had a right to rely on the representation; and (9) the trustee suffered damages due to his reliance on the false representation. Westby v. Gorsuch, 112 Wn. App. 558, 570 (2002).

The trustee does not identify a factual misrepresentation at any point prior to August 20, 2012, that could form the basis of this claim. With regards to the admitted misrepresentations contained in Corliss' declaration, they were not knowingly or intentionally made. The information Corliss' staff compiled was mistakenly limited to checks issued to Mastro: it was incomplete and misleading. Corliss, for his part, was careless. He knew payments had been made on the loan and that he had authorized a wire transfer that zeroed out the account, but did not catch and correct the contrary statement drafted by the trustee's lawyer or his staff's omissions. Negligence, however, does not establish an intentional misrepresentation or fraud claim.

With regards to damages, the trustee has not established a causal connection between the admitted failures to disclose and the almost $3 million in damages claimed. With regards to the 68 ounces of gold, the trustee made no effort to show that, had he acquired the gold from Corliss in the summer of 2012, he could have obtained a better price than was available on the market in October 2013 when Corliss relinquished it or that he could have avoided specific activities he subsequently undertook to locate and regain possession of the gold. Instead, the trustee seems to be asserting that, had Corliss timely disclosed the gold, the trustee would have called off the hunt for Mastro's assets and avoided all of the investigative costs incurred after August 20, 2012. The evidence does not support such a claim. The trustee made clear that he was not simply searching

MEMORANDUM OF DECISION - 14

for the gold, he was conducting a due diligence search for any and all assets that could be recovered for the benefit of the creditors. Had the trustee recovered the 68 ounces of gold on August 20, 2012, the only reasonable inference is that the trustee would have continued his search for the other 400+ ounces Mastro and his son had purchased pre-bankruptcy, along with the Range Rover, art, jewelry, diamond rings, and bank accounts Mastro was suspected of having secreted away. The trustee has not established a causal connection between Corliss' failure to disclose the 68 ounces of gold in the summer of 2012 and the expansive, world-wide hunt for assets that was already underway before Corliss' misrepresentations.

With regards to the failure to disclose the $111,600 loan payment, the trustee argues only that he would have been able to recover those funds for the benefit of the creditors had he known about them. As discussed above, however, the funds were not part of the bankruptcy estate and the transfer is not voidable (or, if voidable, would be offset by the credit for value given to which Corliss is entitled) under Washington law.

With regards to the wire transfer of $94,500, the trustee makes no effort to explain what would have been different about his investigation had Corliss disclosed the details of that transfer on August 20, 2012. By that point, the trustee had already found the Royal Bank of Canada account to which the wire had been sent and had ascertained that there were no assets remaining therein. The Mastros were already in Europe: no representation or misrepresentation in the declaration altered that fact. Having eschewed any attempt to segregate activities and costs related to tracking the source of the funds with which the Royal Bank of Canada account was opened, the trustee cannot simply pursue recovery of all of his investigative costs from Corliss regardless of their connection to this omission.

MEMORANDUM OF DECISION - 15

For all of the foregoing reasons, the Court finds in favor of defendant on all claims asserted in this case. The Clerk of Court is directed to enter judgment in favor of defendant and against plaintiff.

Dated this 27th day of July, 2018.

*Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

MEMORANDUM OF DECISION - 16